**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED-ED4

01 JAN 12 PH 4: 37

CLERK
U.S. DISTRICT COURT

NEP Operating LLC, an Illinois limited )
liability company, )
                          )
        Plaintiff, )
                          )
        v. )
                          )
National Petroleum Inc., a Wisconsin )
corporation, and Petrol Properties, LLC, )
a Wisconsin limited liability company, )
                          )
        Defendants.

Case No.

Judge

**01C 0272**

JUDGE CONLON

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

For its Complaint for Damages and Injunctive Relief, plaintiff NEP Operating, LLC, by

undersigned counsel, alleges as follows:

    1.    This action arises out of defendants' wrongful termination of gasoline franchises in

Illinois and other states, in violation of the Petroleum Marketing Practices Act, 28 U.S.C. § 2801 *et.*

*seq.*, (the "PMPA") and other wrongful practices, including conversion and tortious interference,

in violation of the PMPA and common law.

### PARTIES

    2.    Plaintiff, NEP Operating LLC ("NEPO"), is an Illinois limited liability company with

its principal place of business in Illinois.

    3.    On information and belief, defendant National Petroleum, Inc. ("National") is a

Wisconsin corporation with its principal place of business in Kenosha, Wisconsin. On further

information and belief, National is a franchisor within the meaning of the PMPA.

4.      On information and belief, defendant Petrol Properties, LLC ("Petrol") is a Wisconsin limited liability company with its principal place of business in Kenosha, Wisconsin.  On further information and belief, Petrol is a franchisor within the meaning of the PMPA, and the owner and/or sublessor of gasoline stations in Illinois, Wisconsin, Indiana and Michigan.

5.      On information and belief, the principal owner of both Petrol and National is Dr. Yogi Bhardwaj, and the two companies are closely related by ownership and otherwise.

## JURISDICTION AND VENUE

6.      Jurisdiction over this matter arises under 28 U.S.C. § 1331 and under the provisions of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et. seq.*  Venue is proper in this district because a substantial part of the events or omissions giving rise to the claim took place in this district, and a substantial percentage of the gasoline properties at issue in this action are situated here.

## GENERAL ALLEGATIONS

7.      On or about October 31, 2000, defendant National entered into a ten-year Petroleum Product Supply Agreement (the "Supply Agreement") with plaintiff NEPO.  Under the terms of the Supply Agreement, "unless either party gives the other party written notice not to extend this Agreement not less than thirty (30) and not more than ninety (90) prior to the expiration of the initial term, this Agreement shall be extended for an additional term of ten (10) years on the same terms and conditions."  A copy of the Supply Agreement is attached as Exhibit A.  On information and belief, the Supply Agreement is a franchise agreement within the meaning of the PMPA.

8.      Further, under the terms of the Supply Agreement, National agreed to erect appropriate signage at various gas stations covered by the Agreement, to sell petroleum to NEPO in accordance with the terms of such Agreement, and granted NEPO certain other rights associated with

the operation of gasoline stations. In turn, NEPO agreed to operate certain gasoline stations in accordance with the Agreement.

9.      In accordance with paragraph 23 of the Supply Agreement, all notices "must be in writing and in compliance with the PMPA and other applicable Law." The Supply Agreement was drafted exclusively by or for National.

10.     On or about October 31, 2000, Petrol and NEPO entered into an Operating Agreement under which NEPO agreed to operated about sixty gasoline stations located in Illinois, Indiana, Wisconsin and Michigan that are owned by Petrol.

11.     On or about October 31, 2000, Petrol and NEPO also entered into a Sublease and Operating Agreement under which NEPO agreed, as sublessee, to operate another eight gasoline stations located in Wisconsin that are subleased by Petrol from another party.

12.     Collectively, the Supply Agreement, Operating Agreement and Sublease Operating Agreement are referred to herein as "the Agreements."

12.     In connection with its operation of the dealerships at issue, NEPO has separate agreements with the various operators at each location. On information and belief, and in violation of the Agreements:

        a.      National started contacting such dealers directly over the past two weeks;

        b.      Defendants wrongfully attempted to established a selling relationship with the majority of the dealers.

        c.      Defendants attempted to get the dealers to breach their separate agreements with NEPO by telling them that they would not receive gasoline unless they paid cash for the gasoline loads. Defendants further instructed them to price their own accounts and not to agree to our pricing arrangement.

    d.       Defendants have instructed the dealers that they need to sign new agreements with National immediately.

    e.       National has refused to supply dealers unless paid for by cash.

    f.       National office has threatened to fire employees of various locations if they did not deposit daily cash in his accounts, and not to use NEPO's accounts.

    g.       National employees have gone to NEPO franchise locations and removed keys for the facility (e.g., in Racine and 6 other locations) and, on information and belief, has tried to the same with all others.

    h.       National has sent payroll employment kits to all company owned locations in order to "hire" over two hundred of NEPO's employees.

    13.       NEPO wired $130,000 to National on Tuesday, January 9, 2000, for prepayment of gasoline to dealer accounts on the promise that National would deliver gas to all dealer accounts. However, no gasoline was delivered, thereby endangering NEPO's relationship with its dealers.

    14.       On information and belief, and in violation of the PMPA and the dealer agreements, National has wrongfully set up meeting for Saturday, Janaury 13, 2000, to set up lines of credit with the dealersto supply them with gasoline.

    15.       On information and belief, defendants, through their principal and others, have contacted two of NEPO's field supervisors in an attempt to break NEPO's employment agreements and join National. Defendants have repeatedly made those phone calls as late as the date of this filing.

    16.       NEPO is the licensee and permit holder for all company stores for gasoline, lottery, alcohol driveway, etc. On information and belief, defendants have instructed the sites not to allow NEPO personnel to enter the property or to take any documents, etc. from the locations and to call

legal authorities if NEPO attempts to do so. Hence, several NEPOr employees feel they are being harassed and therefore have resigned their positions.

17.     On information and belief, on the morning of this filing, National instructed the haulers that the gasoline needed to be siphoned from the tanks of our locations due to contamination. At least five locations are involved. National has tried to go to several other locations but NEPO has instructed its sites that there is not contamination and not to allow these efforts. However, there remains a grave risk that Defendants will be successful in siphoning additional gasoline.

18.     On information and belief, National converted NEPO company inventory to National own use by sweeping NEPO's accounts of gas proceeds.

## COUNT I

### (Wrongful Termination Under the Petroleum Marketing Practices Act)

19.     Plaintiff reasserts and realleges paragraphs 1-18.

20.     The Petroluem Marketing Practices Act provides:

[N]o franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may--

(1) terminate any franchise (entered into or renewed on or after the date of enactment of this Act [enacted June 19, 1978]) prior to the conclusion of the term, or the expiration date, stated in the franchise; or

(2) fail to renew any franchise relationship (without regard to the date on which the relevant franchise was entered into or renewed).

15 U.S.C. 2802(b)

21.     Defendants wrongfully terminated their franchise agreements with plaintiff by taking the actions set forth above.

22.     As a result of defendants' wrongful termination, NEP has suffered damages including, but not limited to, business lost by virtue of defendants' wrongful acts.

## COUNT II

### (Breach of Contract)

23.     Plaintiff reasserts and realleges paragraphs 1-18.

24.     Defendants actions constitute material breaches of the Petroleum Product Supply Agreement, the Sublease and Operating Agreement and the Operating Agreement.

25.     NEP has performed all conditions on its part to be performed under the Petroleum Product Supply Agreement, the Sublease and Operating Agreement and the Operating Agreement.

26.     As a result of defendants' breaches, NEPO has suffered damages including, but not limited to, business lost by virtue of defendants' wrongful acts identified above.

## COUNT III
### (Tortious Interference With Contract)

27.     Plaintiff reasserts and realleges paragraphs 1-18.

28.     The Petroleum Product Supply Agreement and the Sublease and Operating Agreement are valid and enforceable contracts between plaintiff and defendants. The agreements between NEPO and its dealers are also enforceable agreements.

29.     These acts constitute defendants' intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages.

30.     Defendants exercise of  seriously and substantially interferes with NEP's  right to use and and control over its relationships with the dealers.

WHEREFORE, plaintiff NEP Operating LLC respectfully requests that this Court enter a temporary, preliminary  and permanent injunction against the wrongful practices alleged above, that it further grant judgment in its favor and against defendants in an amount to be determined at trial, and that it further awards plaintiff its costs and attorneys' fees in bringing this action.

Respectfully submitted,

**NEP OPERATING LLC**

By: _____
One of Plaintiffs' Attorneys

Arthur F. Radke
Richard E. Gottlieb
Sara E. Lorber
DYKEMA GOSSETT PLLC
55 East Monroe Street, Suite 3050
Chicago, Illinoís 60603
(312) 551-4900
CHI01\ 24826.1

7

# EXHIBIT A

JAN.12.2001 1:10:20AM   ONAL PETROLEUM        +262    2230        NO.884   P.2/15
                                                                 T-805  P.002  F-280

# PETROLEUM PRODUCT SUPPLY AGREEMENT

Supply agreement made as of October 31, 2000, between **NATIONAL PETROLEUM, INC.**, with an office located at 6621-39ᵗʰ Avenue, Kenosha, WI 53142 hereinafter called "Seller", and NEP Operating LLC with an office located at 22 S. Washington Ave. in Park Ridge, Illinois hereinafter called "Retailer":

1.    **DEFINITIONS.** As used in this Agreement, the terms below have the following meanings, whether singular or plural:

(a)    "Alternation" - Any addition, modification, removal or replacement of any building, improvement or equipment at Retailer's Station.

(b)    "Business Entity" - Any legal entity that is not an individual or sole proprietorship, including, without limitation, a partnership, corporation, limited liability company, limited liability partnership, or association.

(c)    "Identifications" - The trademarks, trade dress, service marks, and color schemes of the brand designated in PART I and licensed to Retailer by Seller for use by Retailer at Retailer's Station in connection with the resale of Products under the terms of this Agreement.

(d)    "Law" - Any applicable constitution, statute, ordinance, regulation, rule, administrative order, or other requirement of any federal, state, or local government agency or authority in effect at the time of execution, or during the term, of this Agreement.

(e)    "Products" - The gasoline and diesel sold to Retailer by Seller for resale under the brand Identification designed by Seller.

(f)    "Plant" - The distributing plant from which deliveries of Products are made to Retailer.

(g)    "PMPA" - The Petroleum Marketing Practices Act as may be amended from time to time (15 U.S.C. §2801 et seq.).

(h)    "Retailer's Station" - The motor fuel dispensing station or stations or automobile service station or stations, as the case may be, and associated facilities located at the address or addresses identified in Exhibit A incorporated by reference and operated by Retailer under this Agreement.

2.    **PURCHASE AND SALE OF PRODUCTS.**

Seller shall sell and deliver to Retailer and Retailer shall purchase and accept from Seller the minimum quantities of Products during each calendar month as identified in the Attached Exhibit B incorporated by reference ("Minimum Quantities"). All Products for the locations in Exhibit A are to be purchased from Seller. Seller may, but is not obligated to, sell Retailer more than the Minimum Quantities. Seller may adjust the Minimum Quantities pursuant to any applicable Federal or state mandatory or voluntary allocation program or in accordance with Article 15 so long as the Retailer is allocated on the same basis as other retailers and the same as Seller's Company operated locations. If Retailer fails to purchase the Minimum Quantities, Seller may exercise Seller's right to terminate or nonrenewal of this Agreement under Article 3.



1

### 3.   TERM OF AGREEMENT; EXTENSION.

Unless sooner terminated under the terms of the Agreement, the initial term shall be for a term of ten (10) years from the date of this Agreement. Unless either party gives the other party written notice not to extend this Agreement not less than thirty (30) and not more than ninety (90) days prior to the expiration of the initial term, this Agreement shall be extended for an additional term of ten (10) years upon the same terms and conditions.

### 4.   PRICES AND TERMS OF PAYMENT.

(a)   Retailer shall pay Seller for the Products at the price in effect at the time loading commences at the Plant for the place of delivery. Retailer may ascertain Seller's current prices at Seller's offices or at such other place designated by Seller. Seller's current pricing for the Products is set forth in Exhibit C incorporated by reference.

(b)   Retailer shall pay for the Products sold to Retailer seven days from date of delivery or extended to 10 days upon posting an acceptable $700,000 letter of credit. Seller may require the use of Electronic Funds Transfer (EFT) systems, or other mutually acceptable methods selected by Seller from time to time. If Seller elects to extend credit to Retailer, Retainer shall comply with Seller's credit terms in effect from time to time, any of which may be altered or revoked by Seller without prior notifications to Retailer. Retailer shall provide any written authorizations required for EFT purposes. In the event Retailer shall fail to pay for the Products in accordance with Seller's payment terms, Seller, among other remedies, may suspend or terminate deliveries of the Products to Retailer. Upon Seller's request, Retailer shall provide Seller with information and documents relating to Retailer's financial condition and creditworthiness.

(c)   Seller may assess a reasonable administrative fee upon Retailer for payments that are returned or rejected for lack of sufficient funds or for any other reason within Retailer's control. All overdue sums owed to Seller will bear interest at the maximum lawful rate per annum from the date due until paid. Without limiting the generality of the foregoing, Seller may setoff or equitably recoup against any amount then due Retailer, defer further deliveries of the Products until payment of all outstanding indebtedness is made, and demand advance cash payment for further deliveries. Retailer shall comply with the terms of any reclamation notice issued to Retailer by Seller under applicable law.

### 5.   SELLER'S MARKETING RIGHTS.   Provided such changes are mutually acceptable

to Retailer and Seller, Seller may, from time to time: (a) change the Identification applicable to any Product and require Alterations in accordance therewith; (b) add, change, or modify the grade, brand name, delivery package, or other distinctive designation of any Product; (c) change or modify the formulations and specifications of any Productions; and (d) discontinue at any time the sale of any Product in which event the parties will be relieved of any further obligations with respect to that Product.

### 6.   SIGNS; USE OF SELLER'S NAME.

(a)   Seller, at Retailer's expense and cost, shall erect signs of Seller's choosing on the building and at the street of usual and customary size for a Station of this type, for the purpose of advertising the brand of Product to be sold by Seller to Retailer. Seller shall, at Retailer's expense, change signs if Seller changes the source of Product supply at Retailer's request. Retailer shall be responsible for fees and taxes for any taxing authority for the signs located at the site of the Station(s). All signage, including installation and use, shall be subject to all applicable governmental laws, regulations and ordinances.

(b)    Retailer shall not use, or have the right to use, the name "National Petroleum" or "Marathon" or any variant of such names, except as expressly authorized by Seller or Marathon Oil Company. National Energy Properties, NEP, NEP Operating (NEPO), or similar names are acceptable.

7.    **NO EXCLUSIVE TERRITORY.**    Nothing in this Agreement grants Retailer an exclusive territory to market and resell any Products. Seller reserves the right to market and sell, and authorize others to market and sell, Products in any manner Seller chooses, including through its own retail outlets or through designated wholesalers or other retailers.

8.    **DELIVERIES.**

(a)    All Products will be sold by Seller to Retailer F.O.B. destination (Retailer's Station or Stations). Unless otherwise subsequently agreed by the parties in writing, Seller shall be the exclusive transporter of the Products to Retailer under this Agreement, so long as Seller provides commercially competitive rates for such deliveries. In the event Retailer shall determine that it can obtain delivery charges, for the type, quantity and delivery times of Products, which are less than those charged by Seller, Retailer shall give notice thereof to Seller with proof or documentation of such lower delivery charges and Seller shall have the first right to match such delivery charges of the Products. Should Seller decide not to match the lower delivery charges, Retailer may arrange for the delivery of product at their expense, If not, Seller agrees to use the other delivery company.

(b)    For Products sold F.O.B. destination, title and risk of loss passes to Retailer when the Products pass the fill tube connection into Retailer's storage equipment as long as Seller delivers in accordance with applicable laws.

(c)    Seller may make deliveries of the Products to Retailer's Station or Stations by any means of transportation. Retailer shall allow shipments in transport trucks provided by Seller to be unloaded immediately upon arrival. Retailer shall pay for any time in excess of the free unloading time for contract or common carriers as identified in the contract or tariff. Retailer will be allowed one hour of free time for unloading trucks owned or operated by Seller after which Retailer shall pay $25.00 per quarter hour until the shipment is unloaded so long as any delays are not due to actions of the Seller.

(d)    Seller is not obligated to make any delivery outside of its usual business hours (6:00 a.m. to 10:00 p.m. Monday through Saturday, excepting national and state holidays) or in any quantity less than 7,800 gallons. Retailer shall pay for any redistribution charges if Retailer, without justification, fails to accept all of any delivery by Seller. Delivery is to be made only upon Retailer's request within 24 hours on a best efforts basis but in no case later than 48 hours. If delivery is to be made at times other than the above times, it is to be delivered only upon the consent of the Retailer.

9.    **INSPECTION AND AUDIT.**    Seller, its agents and representatives may enter Retailer's Station, at all reasonable times, to inspect the facilities, procedures, and materials being used in the sale of the Products, to obtain samples of an conduct tests on the Products, to inspect the books and records pertaining to the sale of Products, and to audit, observe, and otherwise verify Retailer's compliance with this Agreement.

10.    **TAXES.**    Retailer shall pay all federal, state, and local taxes, excises, duties, and other assessments and charges of any kind and nature, now or hereafter levied ("Taxes") assessed by any governmental authority relating to the importation, manufacture, sale, purchase, transportation, storage, resale, or use of the Products insofar as the same is not expressly included in the price for the Products or other products. If Retailer pays directly any tax normally remitted by Seller, Seller may require proof of

3



Case: 1:01-cv-00272 Document #: 1 Filed: 01/12/01 Page 12 of 48 PageID #:12

payment of such changes from Retailer and may require Retailer to provide a bond or other form of security necessary to protect Seller against loss arising from nonpayment. Retailer shall furnish Seller with satisfactory tax exemption certificates where an exemption is claimed.

11. **WARRANTY AND DISCLAIMER.** SELLER WARRANTS THAT ALL PRODUCTS SOLD TO RETAILER WILL MEET SELLER'S THEN CURRENT SPECIFICATIONS AND ALL GOVERNMENTAL REGULATIONS AND REQUIREMENTS. SELLER MAKES NO OTHER WARRANTIES OF ANY KIND AS TO THE PRODUCTS SOLD TO RETAILER, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTIABILITY OR FITNES FOR A PARTICULAR PURPOSE.

12. **CLAIMS.**

(a) Seller will not be liable to Retailer for any defect in quality or shortage in quantity of the Products unless: (1) Retailer gives Seller notice within 48 hours after delivery for shortages and within five (5) days after delivery for quality defects (or five (5) days after discovery if the defect is latent) and (2) Retailer provides Seller with 48 hours to inspect, take samples, and test the Products that are the subject of the claim.

(b) Except as set forth in Article 16, Indemnity, or claims relating to indebtedness, Seller's equipment, or as otherwise specified in this Agreement, the parties will not be liable to each other for any other claim arising out of this Agreement unless the claimant provides the other party with notice of the claim (setting forth fully the facts on which the claim is based) within 180 days after the date on which the claim arose.

13. **LIMITATION ON LIABILITY.** Retailer's sole and exclusive remedy for any claim arising from or in connection with any alleged failure of or defect in any Products sold by Seller to Retailer (whether the claim is for breach of contract or warranty or is under tore, strict liability, statute or otherwise) will be (a) at Seller's option, replacement of the failed, defective, or nonconforming Products or reimbursement of the purchase price thereof plus removal costs and actual damages, and (b) reimbursement of the reasonable cost of repair or replacement of any mechanical equipment or parts that are damaged directly by use of such Products. In no event will either party be liable to the other for any indirect, special, incidental, consequential, or punitive damages arising under this Agreement whether under tort, contract, strict liability, warranty, statute, or otherwise.

14. **COMPLIANCE WITH LAWS.**

(a) Retailer shall comply with all Laws relating to the Retailer's Station and the business conducted thereon, including, but not limited to, those pertaining to environmental protection, safety, and health matters.

(b) Without limiting the generality of the foregoing, Retailer and Seller shall comply with all Laws, licenses, and permits relating to unleaded gasoline, oxygenated gasoline, reformulated gasoline, Reid vapor pressure, fuel additives, and diesel fuel. Further, if Retailer owns or operates any UST system (as defined in applicable Laws), Retailer shall comply with all applicable Laws governing UST systems, including, but not limited to, financial responsibility requirements through mechanisms provided for in said Laws such as guarantees, surety bonds, and insurance.

15. **EXCUSES FOR NONPERFORMANCE.** Both parties will be excused from their obligations under this Agreement (except for financial obligations) to the extent that performance is



4

Case: 1:01-cv-00272 Document #: 1 Filed: 01/12/01 Page 13 of 48 PageID #:13



delayed or prevented by any of the following matters: circumstances reasonably beyond the parties' control; fire, explosion, ice storm, snowstorm, or earthquake; delay or loss of transportation or delivery equipment; mechanical breakdown; strikes or other labor trouble, plant shutdown, riots, or other civil disturbances.

16.   INDEMNITY.

(a)   TO THE EXTENT PERMITTED BY LAW, RETAILER SHALL INDEMNIFY AND DEFEND SELLER, ITS MEMBERS, SUBSIDIARIES, AND AFFILIATES, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS ("INDEMNIFIED PARTIES") AGAINST ALL CLAIMS, DEMANDS, CAUSES OF ACTION, SUITS, DAMAGES, JUDGMENTS, LIENS, PENALTIES, AND EXPENSES, INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND LITIGATION COSTS, WHETHER INCURRED FOR AN INDEMNIFIED PARTY'S PRIMARY DEFENSE OR FOR ENFORCEMENT OF ITS INDEMNIFICATION RIGHTS (COLLECTIVE, "CLAIM"), INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR HARM, INJURY, OR DEATH TO ANY PERSON, OR DAMAGE TO PROPERTY OR TO THE ENVIRONMENT ARISING OUT OF OR IN CONNECTION WITH ANY OF THE FOLLOWING MATTERS:

(1)   RETAILER'S PERFORMANCE OR NONPERFORMANCE UNDER THIS AGREEMENT;

(2)   ANY ACTION OR OMISSION OF RETAILER OR RETAILER'S EMPLOYEES, AGENTS, CONTRACTORS, ASSIGNS, OR THIRD PARTIES; AND

(3)   THE OPERATION OF RETAILER'S BUSINESS.

RETAILER'S OBLIGATION TO INDEMNIFY AND DEFEND EXTENDS TO ANY CLAIM CAUSED BY THE CONCURRENT OR CONTRIBUTORY NEGLIGENCE OR FAULT OF AN INDEMNIFIED PARTY BUT NOT TO ANY CLAIM SHOWN BY FINAL NONAPPEALABLE JUDGMENT TO HAVE BEEN CAUSED BY THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE OR NEGLIGENCE OF INDEMNIFIED PARTY AND A THIRD PARTY, OR ANY DEFECT IN THE PRODUCTS NOT CAUSED OR CONTRIBUTED TO BY ANY NEGLIGENCE OR FAULT OF RETAILER.

(b)   WITHIN 24 HOURS AFTER THE OCCURRENCE OF WHICH MAY RESULT IN A WRITTEN CLAIM, RETAILER SHALL REPORT THE SAME TO SELLER BY TELEPHONE AND SHALL PROMPTLY THEREAFTER CONFIRM THE SAME BY WRITTEN NOTICE, INCLUDING ALL CIRCUMSTANCES THEREOF KNOWN TO RETAILER OR RETAILER'S EMPLOYEES.

(c)   PROMPTLY AFTER RECEIVING NOTICE, AT RETAILER'S EXPENSE, RETAILER SHALL INVESTIGATE, RESPOND TO, AND DEFEND ANY CLAIM ASSERTED AGAINST ANY INDEMNIFIED PARTY, INCLUDING, WITHOUT LIMITATION, ANY CLAIM ALLEGING THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE.  THE INDEMNIFIED PARTY MAY PARTICIPATE IN THE DEFENSE AND SETTLEMENT OF ANY CLAIM OR LITIGATION WITH ATTORNEYS OF THE INDEMNIFIED PARTY'S SELECTION WITHOUT RELIEVING RETAILER OF ANY OBLIGATIONS UNDER THIS ARTICLE; PROVIDED, HOWEVER, THE INDEMNIFIED PARTY SHALL BE RESPONSIBLE FOR ITS OWN ATTORNEY'S FEES.  SELLER SHALL REIMBURSE RETAILER FOR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT AND REASONABLE DEFENSE COSTS



PAID BY RETAILER WHICH REPRESENTS THE INDEMNIFIED PARTY'S TOTAL LIABILITY FOUND BY FINAL NONAPPEALABLE JUDGMENT OR SETTLEMENT TO HAVE BEEN CAUSED BY THE INDEMNIFIED PARTY'S SOLE NEGLIGENCE OR NEGLIGENCE OF INDEMNIFIED PARTY AND A THIRD PARTY, OR PRODUCT DEFECT AS SPECIFIED ABOVE.

(d)    THE INSURANCE REQUIREMENTS OF ARTICLE 17 DO NOT LIMIT OR RESTRICT IN ANY WAY RETAILER'S OBLIGATIONS UNDER THIS ARTICLE.

(e)    RETAILER'S OBLIGATIONS UNDER THIS ARTICLE SURVIVE TERMINATION OR NONRENEWAL OF THIS AGREEMENT.

17.    INSURANCE.

(a)    Retailer shall maintain, at its sole cost, at all times during the term of this Agreement, the following insurance coverage with providers satisfactory to Seller with limits not less than those limits below (the "Insurance"):

(1)    Commercial General Liability Insurance unamended or Comprehensive General Liability Insurance with Broad Form CGL endorsement with limits of $1,000,000 each occurrence and $1,000,000 general aggregate, with Fire Legal Liability limits of $300,000 each occurrence. Retailers owning or operating up to and including three locations are subject to the minimum limits above. Retailers owning or operating four and five locations shall amend their policy aggregate to $3,000,000. Retailers owning or operating six or more locations shall amend their policy aggregate to $5,000,000. In lieu of amending aggregate limits as described in this Article, endorsement CG 25 04 amending aggregate limits per location may be utilized when applied to the above-described minimum limits. Limits in excess of $1,000,000 may be provided by Excess Liability or Umbrella Liability coverage. Blanket coverage with the above limits is acceptable.

(2)    Workers' Compensation Insurance as required by Laws and regulations applicable to and covering employees of Retailer during the term of this Agreement.

(5)    A policy of liability and property damage insurance insuring against the presence or release at the Station(s) or adjoining real estate of any hazardous substances, including spills, leakage or release of petroleum products. This insurance shall be in amounts, with terms and from an insurer acceptable to Seller.

(b)    Retailer shall assure that the Insurance policies provide a waiver of subrogation in favor of Seller where permissible by Law, and provide for written notice of cancellation or material change. Notice of cancellation or change will not affect the Insurance until 30 days after Seller receives written notice. Any deductible or retention of insurable risks will be the Retailer's account.

(c)    Retailer shall assure the Insurance required in this Article and such certificate evidencing the Insurance issued to Retailer names Seller and its members, subsidiaries, affiliates and joint venture partners, to the extent of their interest, as additional insureds, without regard to the allocation of liability provisions contained in this Agreement, to the extent of any claim, loss or liability within the scope of the required Insurance. The parties intend that, to the extent of their interest, the status of Seller and its members, subsidiaries, and affiliates as additional insureds will not be limited..

(d)    Within 30 days after the execution of this Agreement and during the term of this Agreement, Retailer shall provide Seller with a certificate of Insurance evidencing Retailer's compliance

6

with Seller's Insurance requirements. Retailer's failure to provide certificates evidencing the requirements or purchase Insurance coverage in compliance with this Article will not relieve Retailer of its obligations in this Article.

18.    **RIGHT OF FIRST REFUSAL.** Retailer may not transfer any of Retailer's interest in this Agreement without first offering, in writing, to transfer the same to Seller or its designee on terms and conditions which are the same as those of the proposed transfer to a third party ("Transferee"). Seller will have 30 days after receipt of the offer and a complete and exact copy of the Transferee offer to accept or reject the offer. If Seller rejects the offer, Retailer may make the proposed transfer to the Transferee, but not at a lower price or on more favorable terms than those offered to Seller. If the transfer to the Transferee is not consummated within four months from the expiration of the 30-day period, Retailer shall re-offer the interest to Seller in accordance with the foregoing provisions.

19.    **TERMINATION OR NONRENEWAL.**

(a)    Termination by Seller. Subject to any limitations imposed by Law and the provisions of Article 15 of this Agreement, and in addition to all other rights or remedies available, Seller may terminate this Agreement for any of the following grounds:

(1)    Retailer's failure to comply with any material provision of this Agreement, which breach continues for a period of 15 days after written notice to Retailer by Seller;

(2)    The occurrence of an event which is relevant to the relationship under this Agreement and as a result of which termination of this Agreement is reasonable, including without limitation, the following events:

(i)    Retailer's declaration of bankruptcy or judicial determination of insolvency;

(ii)    Condemnation or other taking, in whole or in substantial part, of Retailer's Station pursuant to the power of eminent domain;

(iii)    Destruction (other than by Seller) of all or a substantial part of Retailer's Station, but not if Retailer timely rebuilds;

(iv)    Retailer's failure to pay to Seller in a timely manner when due all sums in which Seller is legally entitled under this Agreement;

(v)    Retailer's failure to maintain a sufficient amount of all grades of Seller's branded gasoline and, if applicable, branded diesel fuel, or Retailer's failure to operate Retailer's Station, for thirty consecutive days, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(vi)    Retailer's willful adulteration, mislabeling, or misbranding of motor fuels or other trademark violations;

(vii)    Retailer's knowing failure to comply with the Laws relevant to the operation of Retailer's Station.

(viii)    Retailer's failure to comply with the Insurance requirements under Article 17.

7



(b)   Termination by Retailer.  Subject to any limitations imposed by Law and the provisions of Article 15 of this Agreement, and in addition to all other rights or remedies available, Retailer may terminate this Agreement for any Seller's failure to comply with any material provision of this Agreement, which breach continues for a period of 15 days after written notice to Retailer by Seller.

20.   **LIQUIDATED DAMAGES.**  In the event of a breach of this Agreement by Retailer, Retailer agrees that it shall be liable for liquidated damages in the amount of $0.0225 per gallon of Products for the remainder of the unexpired initial or renewal term for the (a) average number of gallons of Products during the six (6) month period immediately prior to that breach, or (b) the Minimum Quantities stated in Exhibit B to this Agreement, whichever is greater.  Retailer acknowledges that Seller will sustain substantial damages in the event of breach of this Agreement by Retailer and that the amount of such damages would be difficult or impossible to ascertain or measure.  Retailer further acknowledges that the amount of liquidated damages as provided in this Agreement is reasonable and expressly waives any right to claim that those liquidated damages are excessive.

21.   **INJUNCTIVE RELIEF.**  Retailer acknowledges that Seller is relying upon this Agreement, and the Minimum Quantities of Products to be purchased by Retailer under this Agreement, in negotiating supply agreements with Seller's suppliers.  In the event of an attempted transfer of this Agreement by Retailer, voluntary or by operation of law, without the prior written consent of Seller, or in the event Retailer shall breach, or threaten to breach, this Agreement by procuring the Products from a supplier other than Seller, among other remedies available to Seller, Seller may secure injunctive relief from a court of competent jurisdiction restraining such breach or threatened breach of this Agreement.  Retailer acknowledges that Seller's remedies at law may be inadequate or fail to fully remedy the losses to Seller and therefore expressly authorizes Seller to procure injunctive relief in the event of such breach or threatened breach of this Agreement.

22.   **INDEPENDENT CONTRACTOR.**  Retailer is an independent contractor and Seller has not right to exercise control or direction over any aspect of the Retailer's business or the operations conducted at Retailer's Station, including, but not limited to, the prices at which Retailer sells its products.  Nothing in this Agreement is intended to interfere with or diminish Retailer's complete control over and sole responsibility for the health, safety, and security matters at Retailer's Station.  This Agreement does not establish any partnership, joint venture, employment, or agency between the parties or Retailer's employees or agents.

23.   **NOTICES.**

(a)   All notices must be in writing and in compliance with the PMPA and other applicable Law.  Subject to any requirements of Law, any notice may be given to Retailer by personal service or to either party by certified mail, regular mail, telegram, facsimile, mailgram, or overnight or local courier.  Notice will be deemed given when:  (1) deposited in the U.S. Mail, postage or charges pre-paid and directed to the party for whom intended at the address in this Agreement or such other address as directed by the party upon written notice to the other if given by certified mail or regular mail; (2) deposited with the dispatching agency, postage or charges pre-paid and directed to the party for whom intended at the address in this Agreement or such other address as directed by the party upon written notice to the other if given by telegram, mailgram or overnight or local courier; or (3) confirmation is received by the sending party if given by facsimile.

(b)   Seller may give notice to:  (1) the key management person of Retailer, or (2) any officer or director of a corporation or limited liability company; (3) any partner of a partnership or limited liability partnership; or (4) any personal representative, agent, or employee of any other business entity.

8



NO.884    P.10/15

NJAN.12.2001:1510:24AM  FROM...ONAL PETROLEUM          +282 b 2290      T-605  P.010/015  F-280

24.     **ATTORNEY'S FEES.** Seller will be entitled to recover from Retailer reasonable attorney's fees and other legal costs Seller incurs in order to secure or protect the rights inuring to Seller under this Agreement, or to enforce the terms thereof.

Retailer will be entitled to recover from Seller reasonable attorney's fees and other legal costs Retailer incurs in order to secure or protect the rights inuring to Retailer under this Agreement, or to enforce the terms thereof.

25.     **ASSIGNMENT.** This Agreement may be assigned by Retailer with the prior written consent of Seller, which consent shall not be unreasonably withheld.

26.     **GENERAL PROVISIONS.**

(a)     This Agreement cancels and supersedes all prior and contemporaneous representations, inducements, agreements, commitments, and undertakings with respect to the subject matter of this Agreement.

(b)     Except as expressly provided under this Agreement, this Agreement may be amended or supplemented only in writing signed by both parties.

(c)     Any waiver of any provision of this Agreement must be in writing signed by the parties. Either party's delay or failure to enforce any provision of this Agreement or any course of dealing or trade custom or usage will not operate as a waiver of compliance with that provision or a waiver or estoppel of the party's right to enforce any other provision of this Agreement.

(d)     The provisions of this Agreement are severable. If any provision of this Agreement is, for any reason, invalid or unenforceable, the remaining provisions of this Agreement are valid and enforceable if the basic intent of the parties is still capable of being achieved.

(e)     Except as provided in Article 25, this Agreement is binding upon and enforceable against the parties' respective successors, permitted assigns, legal representatives, executors, administrators, heirs, and legatees.

(f)     Neither this Agreement nor any subsequent agreement amending or supplementing this Agreement is binding unless a duly authorized representative of Seller and Retailer signs the Agreement, amendment, or supplement.

In Witness Whereof, the parties have executed this Agreement by their duly authorized officer, member, manager, or partner, as of the date above stated.



Seller:

National Petroleum, Inc.

By: _____
Dr. Yogi Bhardwaj, President

Retailer:

NEP Operating, LLC

By: _____
National Energy Properties, LLC, Managing Member

By: _____
Its: Managing Member

JAN.12.2001 10:24AM-NATIONAL PETROLEUM +252 230    NO.884    P.12/15
T-606   P.012/015   F-280

# EXHIBIT A

| | Unit # | Street | City | State |
|---|---|---|---|---|
| 1 | 2003 | 226 N. Richmond St. | Appleton | WI |
| 2 | 2006 | 129 Forest Avneue | Fond Du Lac | WI |
| 3 | 2014 | 1130 Williamson | Madison | WI |
| 4 | 2029 | 905 Main Street | Watertown | WI |
| 5 | 2033 | 825 N. Stevens | Rhinelander | WI |
| 6 | 2035 | 705 Lawe Street | Kaukauna | WI |
| 7 | 2044 | 1616 Durand Avenue | Racine | WI |
| 8 | 2047 | 1739 Main Blvd. | Green Bay | WI |
| 9 | 2066 | 314 W. Main Street | Stoughton | WI |
| 10 | 2072 | 154 N. 4th Avenue | Sturgeon Bay | WI |
| 11 | 2076 | 866 N. Main Street | Richland Ctr | WI |
| 12 | 2123 | 245 N. Main Street | Fort Atkinson | WI |
| 13 | 4091 | 2411 8th Street South | WI Rapids | WI |
| 14 | 4096 | 803 Sperior Street | Antigo | WI |
| 15 | 4155 | 404 N. Parker Drive | Janesville | WI |
| 16 | 4169 | 907-20th Avenue | Monroe | WI |
| 18 | 4224 | 211 8th Street South | Rpds | WI |
| 19 | 4233 | 1616 Maria Drive | Stevens Point | WI |
| 20 | 6249 | 640 Chicago Avenue | Niles | MI |
| 21 | 7063 | 4318 Red Arrow Hwy | Stevensville | MI |
| 22 | 5389 | 900 E. Mishawaka | Elkhart | IN |
| 23 | 6025 | 237-244 W. Jefferson | Franklin | IN |
| 24 | 6044 | 701 W. Memorial Dr. | Muncie | IN |
| 25 | 6059 | 1908 US 52 West | West Lafayette | IN |
| 26 | 6082 | 52384 US 31 | South Bend | IN |
| 27 | 6089 | 7113 Taft | Merrillville | IN |
| 28 | 6102 | 4979 Franklin | Lawrence | IN |
| 29 | 7211 | 208 Morland Drive | Valparaiso | IN |
| 0 | 4143 | 3003 11th St. | Rockford | IL |
| 1 | 5142 | 912 N. Western Ave. | Perioa | IL |
| 2 | 5372 | 825 N. Main | Glen Elyn | IL |
| 3 | 5383 | 310 Manhattan | Jolliet | IL |
| 4 | 7036 | 1550 Glen Rock | Waukegan | IL |
| 5 | 7049 | 315 S. Michigan | Marshall | IL |
| 6 | 7092 | 743 18th St. | Charleston | IL |
| 7114 | | 312 S. State St. | Westville | IL |
| 7132 | | 171 S. Appleton | Belvidere | IL |
| 7213 | | 105 Broadway | Mt. Vernon | IL |
| 7241 | | 1740 E. Lincoln Hwy | DeKalb | IL |

Case: 1:01-cv-00272 Document #: 1 Filed: 01/12/01 Page 20 of 48 PageID #:20

# EXHIBIT A

| | Unit # | Street | City | State |
|---|---|---|---|---|
| 41 | 7349 | 4399 Broadway | Mt. Vernon | IL |
| 42 | 7351 | 1101 N. 1st | DeKalb | IL |
| 43 | 7548 | 2201 W. Broadway | Mt. Vernon | IL |
| 44 | 7604 | 120 W. First St. | Gibson City | IL |
| 45 | 7617 | 771 Walnut Ave. | Elgin | IL |
| 46 | 7620 | 772 Rt 47 | Huntley | IL |
| 47 | 8314 | 119 S. Cicero Ave. | Chicago | IL |
| 48 | 8325 | 8100 S. Ashland Ave | Chicago | IL |
| 49 | 8330 | 711 S. Halsted St. | Chic. Hghts | IL |
| 50 | 7780 | 11006 Silver Springs | Milwaukee | WI |
| 51 | 8581 | 1701 Phila Rd | Urbana | IL |
| 52 | 5111 | 702 W Lincoln | Charleston | IL |
| 53 | 5188 | 3101 S. Chatham | Springfield | IL |
| 54 | 7023 | RR #7 Baltimore | Wilmington | IL |

No JAN.12.2001 pm10:25P  IONAL PETROLEUM  +484  2290  NO.884  P.14/15  T=405  P.014/015  F=280

# EXHIBIT B—MINIMUM QUANTITIES OF PRODUCTS

27,600,000 gallons annually – Marathon Branded Product

11

JAN.12.2001 7PM10:25AM NAT'L PETROLEUM    +262 6    80    NO.884    P.15/15    T-609    P.015/015    F-290

# EXHIBIT C—CURRENT PRICING OF PRODUCTS

### DTN Cost plus $0.02

# EXHIBIT B

JAN.12.2001  11:26AM   STAK HENZL BICHLER                    NO.887  P.14/23
NOV 30 '00  05:15PM
10/30/2000 MON 14:58  FAX 614 224 8540 DAVID J GLIMCHER CO-PRIP           ☑002/028

# OPERATING AGREEMENT

Operating agreement made as of October 2000, between Petrol Properties, LLC, a Wisconsin limited liability company with principal office at Kenosha, Wisconsin ("Petrol") and NEP Operating LLC with principal offices at 22 S. Washington Ave. in Park Ridge, Illinois ("Operator").

## Recitals

1. Petrol is the owner of the real property and improvements thereon described in the attached Exhibit A incorporated by reference ("the premises").

2. Operator desires to operate the premises as gasoline stations with related products and services on the terms of this agreement.

In consideration of the mutual covenants and promises contained in this agreement, the parties agree as follows:

1. *Operation of Gasoline Station on Premises.* Petrol agrees to retain Operator to operate gasoline stations on the premises, and Operator agrees to operate gasoline stations on the premises, for the term stated in the attached Exhibit B incorporated by reference. The term will commence on the date which Operator secures all governmental approvals, licenses and permits necessary for the operation of the premises as a gasoline station. Petrol agrees to cooperate with Operator in securing such governmental approvals, licenses and permits. Operator agrees to exercise Operator's best efforts to secure all such governmental

JAN.12.2001 11:26AM STAK HENZL BICHLER
NO.887 P.15/23
9378641972 PAGE.10

approvals at the earliest possible date. Nothing contained in this agreement shall be construed to make or constitute Operator a tenant of or owner of the premises.

2. *Operator's Fee to be Paid to Petrol.* Operator shall pay Petrol fees for the operation of the premises in such amounts and at such times as provided in the attached Exhibit C incorporated by reference. All such fees shall not be subject to deduction or offset by Operator and shall be due regardless of any claim which Operator may have, or claim to have, against Petrol.

3. *Compliance with Applicable Laws.* Operator shall timely fully comply with all governmental laws, regulations, ordinances and orders applicable to the premises and the operation of the premises as a gasoline station. Without limiting the foregoing, Operator shall comply with all environmental laws, regulations, ordinances and orders applicable to the premises and the operation of the premises as a gasoline station.

4. *Utilities.* Operator shall timely pay for all telephone, electrical, gas, sewer and water utilities used on the premises. Operator shall also pay for all wire and other technological renovations to the premises in order to install and maintain any computer system used by Operator on the premises.

5. *Property Taxes.* Petrol shall timely pay all real estate taxes and special assessments levied on the premises and all personal property taxes levied on equipment owned by Petrol and located at the premises. Operator shall timely pay all personal property taxes levied on Operator's equipment or other personal property used or kept on the premises.

2

Case: 1:01-cv-00272 Document #: 1 Filed: 01/12/01 Page 26 of 48 PageID #:26

6. *Insurance*. Operator, at Operator's cost, shall keep the premises insured against loss or damage by fire, with standard extended coverage, in an amount determined by the Petrol. Operator, at Operator's cost, shall provide all fire and extended coverage insurance on the equipment, inventory, and other personal property that Operator keeps or stores on the premises.

Insurance against liability for bodily injury in the amount of at least $500,000 for each person and $1,000,000 for each occurrence, and property damage in the amount of at least $500,000 shall be provided by Operator at Operator's cost. That liability insurance shall name Petrol as an additional insured and shall protect both Petrol and Operator from all claims for personal injury, including death, and property damage, whether the claims are under worker's compensation or otherwise, which may arise from operations under this lease.

7. *Use of Premises*. Operator shall use the premises for the operation of gasoline stations with sales of related products and convenience store products and services. Operator shall not allow any waste or nuisance on the premises, or use or allow the premises to be used for any unlawful purpose. Operator shall keep the premises free from refuse.

8. Operation of Business: Employees of Operator. Operator shall be solely responsible for the operation of the gasoline and related uses businesses on the premises. Without limiting the foregoing, Operator shall: (a) be solely responsible for all employees hired by Operator to conduct the business on the premises; (b) fully comply with all supply agreements, equipment leases, and

3

JAN.12.2001 11:27AM   TAK HENZL BICHLER                                    NO.887   P.17/23

10/30/2000 MON 14:59  FAX 614 224 8840 DAVID M GLIMCHER CO-PRIP                   004/028

other agreements entered into by Operator in conducting business on the premises;
and (c) be solely responsible for all sales, use, petroleum and other taxes arising
from Operator's conduct of the business on the premises. Operator shall maintain
adequate inventories of gasoline and other products generally sold on the
premises, except for temporary shortages of inventory not caused by the act or
neglect of Operator and shall keep the premises open for business during hours
customarily maintained for gasoline stations of this type.

9. *Special Provisions Applicable to Agreement.* The parties agree that the
special terms and provisions set forth in Exhibit D attached and incorporated by
reference shall be a part of this operating agreement.

10. *Repairs; Maintenance.* Operator shall make all structural and
mechanical repairs to keep the premises in good repair during the term of this
lease, including repairs to the roof, walls, foundation, mechanical systems,
heating, air conditioning and electrical systems on the premises serving the
premises. Operator, at Operator's cost, shall keep the premises in a good state of
repair, ordinary wear and tear excepted. Operator shall be responsible for the
replacement of any broken glass windows or doors on the premises. All repairs
shall be made in a workmanlike manner and in compliance with all applicable
governmental codes and ordinances. Operator, at Operator's cost, shall timely
remove all snow, ice and debris or other hazards from the parking areas,
walkways, and other areas of the premises to which Operator's employees,
customers and other invitees will have access.

4

· JAN.12.2001  11:28AM    AK HENZL BICHLER                        NO.887   P.18/23
  NOV 30 '00  05:17PM    AK HENZL BICHLER
 10/30/2000 MON 14:59  FAX 614 224 8840 DAVID J GLIMCHER CO-PRIT                    ☒005/028

11. *Non-Liability of Petrol for Damages.*  Petrol shall not be liable for liability or damage claims for injury to persons or premises from any cause relating to the occupancy of the premises by Operator during the term of this operating agreement or any extension of this agreement.  Operator shall indemnify and hold Petrol harmless from all liability, loss or other damage claims, judgments or obligations resulting from any injuries or losses of this nature.

12. *Alterations and Additions.*  Operator shall not make any alteration, improvements, or additions to the premises without the prior written consent of Petrol.  In the event Petrol shall give consent to any such alteration, improvement or addition to the premises, Operator shall promptly pay for any such approved alterations, improvements, or additions and the same shall remain as part of the premises upon expiration or termination of this operating agreement.  Operator shall promptly pay all contractors and suppliers who furnish labor or materials for such approved alterations and additions and shall not permit any liens to be placed upon the premises by reason of any such alterations and additions.

13. *Assignment.*  Operator shall not assign, lease or sublease the premises, voluntarily or by operation of law, or grant to any other person or entity the right to occupy or operate a business on the premises, without the prior express prior written consent of Petrol.

14. *Destruction of Premises.*  If the premises shall, without fault of Operator, be destroyed by fire or other casualty or be so damaged thereby in excess of 5% of the value of the premises (as determined in good faith by Petrol),

5

JAN.12.2001  11:28AM   :AK HENZL BICHLER                          NO.887    P.19/23
NOV 30 '00  05:18PM                                                           ☐ 006/026
10/30/2000 MON 14:59  FAX 614 224 8840 DAVID J GLIMCHER CO-PRIF

Petrol may, by written notice delivered to Operator within thirty (30) days after
destruction or loss, elect to rebuild or repair. In such event, this agreement shall
remain in force, and Petrol shall repair or rebuild the premises within a reasonable
time after adjustment of the loss by insurer, putting the premises in as good
condition as it was at the time immediately prior to the damage or loss. For that
purpose, Petrol may enter the premises and the fees due under this agreement shall
abate proportionately to Operator's loss of use of the premises. If Petrol fails to
make that election within thirty (30) days of the date of loss or damage, this
operating agreement shall terminate and Operator shall deliver possession of the
premises to Petrol and Operator's obligation to pay fees shall cease effective the
date of delivery of possession to Patrol. If the premises shall, without fault of
Operator, be destroyed by fire or other casualty or be so damaged thereby in an
amount equal to or less than 5% of the value of the premises (as determined in
good faith by Petrol), this agreement shall not terminate and Patrol shall repair or
rebuild the premises within a reasonable time after adjustment of the loss by
insurer, putting the premises in as good condition as it was at the time immediately
prior to the damage or loss, and the fees due under this agreement shall abate only
proportionate to Operator's loss of use of the premises.

15. *Default.* Each of the following events shall constitute the default or
breach of this agreement by Operator:

(A) If Operator shall fail to pay Petrol any fees when it shall be due under
the terms of this agreement.

6

F-841  P.08/23  F-493  T-293                  43489295ab8467db          From-ARK LLC LAW ORGANIZATION          14:14 00-30-0PO

(B) If Operator shall fail to maintain the insurance required under this lease.

(C) If Operator shall fail to perform or comply with any of the conditions of this agreement, and if the non-performance shall continue for a period of fifteen (15) days after notice thereof by Petrol to Operator, or if performance cannot reasonably be had within the fifteen (15) day period, Operator shall not in good faith have commenced performance within the fifteen (15) day period and shall not diligently proceed to completion of performance.

(D) If Operator shall vacate or abandon the premises for a period of fifteen (15) or more days.

The waiver by Petrol of one occurrence of a default by Operator shall not be deemed to be a waiver of any subsequent event of default by Operator.

16. *Removal upon Termination of Operating Agreement.* Upon expiration of the term of the operating agreement or upon termination of this operating agreement, Operator shall promptly remove from the premises and deliver possession to Petrol. Such removal shall include all equipment, inventory and other personal property of Operator, its officers, employees, or agents. Any personal property of Operator left on the premises may be sold, scrapped or otherwise disposed of at Petrol's sole discretion.

17. *Rights of Petrol Cumulative.* All rights granted to Petrol under applicable law shall be available to Petrol and shall be deemed cumulative and not exclusive. In the event of default, Petrol may pursue one or more legal or equitable remedies available to Petrol under law.

7

JAN.12.2001   11:29AM   TAK HENZL BICHLER                                      NO.887   P.21/23

10/30/2000 MON 14:59  FAX 614 224 8840 DAVID J GLIMCHER CO-PRIP                        @008/028

18. _Notices._ Any notices to be given under this operating agreement shall
be in writing to the following addresses, or such addresses as the parties shall in
the future designate by written notice:

> Petrol Properties, LLC
> 6621 – 39TH Ave.
> Kenosha, WI 53142
> Attn: Dr. Yogi Bhardwaj
>
> NEP Operating LLC
> C/O National Energy Properties, LLC
> 22 S. Washington Ave.
> Park Ridge, IL 60068
> Attn: Charles Everhardt

A notice shall be deemed given when personally delivered, sent by next day
express delivery, or deposited in the U. S. Mail by certified mail, return receipt
requested.

19. _Subordination_  Operator acknowledges and agrees that this operating
agreement shall be subordinate to any mortgage or security interest presently
existing on, or which Petrol may in the future cause to be placed on, the premises.
Upon request by Petrol or Petrol's mortgagee, Operator shall execute and deliver
such estoppel certificate as that mortgagee or security interest holder shall require
from time to time.

20. _Severability._ If any provision of this agreement is held to be illegal,
invalid or unenforceable, such provision(s) shall be severed and all the remaining
provisions of this agreement shall not be affected thereby and shall remain in full
force and effect.

JAN.12.2001   11:29AM    FAK HENZL BICHLER                              NO.887   P.22/23
10/30/2000 MON 14:59  FAX 814 224 8840 DAVID J GLINCHER CO-PRIP                    ☐009/028

21. *Relationship of Parties.* Nothing contained in this agreement shall be construed to create a partnership or joint venture between the parties, or to make either party the agent, partner, joint venturer, franchisee, or employee of the other party, nor responsible for the debts, obligations or losses of the other party. It is the intent of the parties that they be and remain during the term of this agreement independent contractors.

22. *Total Agreement; Applicable to Successors.* This lease contains the entire agreement of the parties and cannot be changed or terminated except by written instrument subsequently signed by the parties. This operating agreement and the terms and conditions hereof apply to and are binding on the legal representatives, successors and assigns of both parties, except this paragraph shall not be construed to permit an assignment of this agreement in violation of paragraph of this operating agreement.

23. *Applicable Law.* This agreement shall be governed by, and construed in accordance with, the laws of the State of Wisconsin.

T-290  P.03/28  F-341                  43489461873                  From-KSA LLC LAW ORGANIZATION                  13:16  DO-08-450

JAN.12.2001 11:29AM ᴸ ᴛᴀᴋ HENZL BICHLER                    NO.887   P.23/23
NOV 30 '00 05:19PM                                                ☎010/028

10/30/2000 MON 14:58  FAX 814 224 8840 DAVID J GLIMCHER CO-PRIP

18/29/2028 18:41    8472523848              NEP OPERATING LLC           PAGE 21

- IN WITNESS WHEREOF, the parties have executed this operating
agreement, as of the day and year first above written, by their duly authorized
officers, partners, or members.

Petrol Properties, LLC

By: _____
Yogi Bhutani, Managing Member

Operator:

By: _____
SALIK RAO, MANAGING MEMBER

10

From-ESA LLC ORGANIZATION         T-290  P.10/28  F-241

# EXHIBIT  C

JAN.12.2001  11:23AM   J W ORGAN ZAT ON           837964           NO.8872   P.2/23

# SUBLEASE AND OPERATING AGREEMENT

Operating agreement and Sublease made as of October 31, 2000 (the "Effective Date"),
between PETROL PROPERTIES, LLC, a Wisconsin limited liability company with
principal office at 6621 - 39th Avenue, Kenosha, Wisconsin ("Petrol" or "Sublessor") and
NEP OPERATING, LLC, with principal office at 8700 West Bryn Mawr Avenue, Suite
800 South, Chicago, Illinois, 60631 ("Operator" or "Sublessee").

## Recitals

1.      Petrol is the Lessee of the real property and improvements thereon
described in the attached Exhibit A incorporated by reference ("the premises").

2.      Operator desires to sublease and to operate the premises as a gasoline
station with related products and services on the terms of this agreement ("Sublease").

In consideration of the mutual covenants and promises contained in this
agreement, the parties agree as follows:

1.      **Operation of Gasoline Station on Premises.** Petrol agrees to retain
Operator to operate a gasoline station on the premises, and Operator agrees to operate a
gasoline station on the premises, for the term stated in the attached Exhibit B
incorporated by reference. The term will commence on October 31, 2000. Operator
agrees to secure all governmental approvals, licenses and permits necessary for the
operation of the premises as a gasoline station. Petrol agrees to cooperate with Operator
in securing such governmental approvals, licenses and permits. Operator agrees to
exercise Operator's best efforts to secure all such governmental approvals at the earliest
possible date. Nothing contained in this agreement shall be construed to make or
constitute Operator an owner or lessee of the premises.

1

2.  **Sublease.** This Sublease is subject to the terms and conditions of the lease between Petroleum Realty IV, LLC ("Owner") and Petrol dated October 31, 2000 ("Master Lease"). The terms and conditions of the Master Lease are incorporated herein by reference. In the event of default by Petrol under the Master Lease, Owner shall be entitled to terminate this Sublease. If there are any conflicting provisions between the Master Lease and this Sublease, the Master Lease shall prevail.

3.  **Fee to be Paid to Petrol.** Operator shall pay Petrol fees for the subleasing of the premises and the operation of the premises in such amounts and at such times as provided in the attached Exhibit C incorporated by reference ("Real Property"). All such fees shall not be subject to deduction or offset by Operator and shall be due regardless of any claim which Operator may have, or claim to have, against Petrol.

4.  **Inventory.** Operator shall purchase the existing inventory on the Premises on the terms provided in Exhibit D.

5.  **Compliance with Applicable Laws.** Operator shall timely fully comply with all governmental laws, regulations, ordinances and orders applicable to the premises and the operation of the premises as a gasoline station. Without limiting the foregoing, Operator shall comply with all environmental laws, regulations, ordinances and orders applicable to the premises and the operation of the premises as a gasoline station.

6.  **Utilities.** Operator shall timely pay for all telephone, electrical, gas, sewer and water utilities used on the premises. Operator shall also pay for all wire and other technological renovations to the premises in order to install and maintain any computer system used by Operator on the premises.

2

7.    Property Taxes. Operator shall timely pay all real estate taxes and special assessments levied on the premises and all personal property taxes levied on equipment or other personal property used or kept on the premises.

8.    Insurance. Operator at Operator's cost, shall keep the premises insured against loss or damage by fire, with standard extended coverage, in an amount determined by the Petrol. Operator, at Operator's cost, shall provide all fire and extended coverage insurance on the equipment, inventory, and other personal property that Operator keeps or stores on the premises.

Insurance against liability for bodily injury in the amount of at least $500,000 for each person and $1,000,000 for each occurrence, and property damage in the amount of at least $500,000 shall be provided by Operator at Operator's cost. That liability insurance shall name Petrol, Owner, and Lehman Commercial Paper Inc. ("Mortgagee") as additional insured and shall protect Petrol, Owner, Mortgagee and Operator from all claims for personal injury, including death, and property damage, whether the claims are under worker's compensation or otherwise, which may arise from operations under this lease.

9.    Use of Premises. Operator shall use the premises for the operation of a gasoline station with sales of related products and convenience store products and services. Operator shall not allow any waste or nuisance on the premises, or use or allow the premises to be used for any unlawful purpose. Operator shall keep the premises free from refuse.

10.    Operation of Business; Employees of Operator. Operator shall be solely responsible for the operation of the gasoline and related uses business on the

3

premises. Without limiting the foregoing, Operator shall: (a) be solely responsible for all employees hired by Operator to conduct the business on the premises; (b) fully comply with all supply agreements, equipment leases, and other agreements entered into by Operator in conducting business on the premises; and (c) be solely responsible for all sales, use, petroleum and other taxes arising from Operator's conduct of the business on the premises. Operator shall maintain adequate inventories of gasoline and other products generally sold on the premises, except for temporary shortages of inventory not caused by the act or neglect of Operator and shall keep the premises open for business during hours customarily maintained for gasoline stations of this type.

11.     **Special Provisions Applicable to Agreement.** The parties agree that the special terms and provisions set forth in Exhibit E attached and incorporated by reference shall be a part of this operating agreement.

12.     **Repairs; Maintenance.** Operator shall make all structural and mechanical repairs to keep the premises in good repair during the term of this lease, including repairs to the roof, walls, foundation, mechanical systems, heating, air conditioning and electrical systems on the premises serving the premises. Operator, at Operator's cost, shall keep the premises in a good state of repair, ordinary wear and tear excepted. Operator shall be responsible for the replacement of any broken glass windows or doors on the premises. All repairs shall be made in a workmanlike manner and in compliance with all applicable governmental codes and ordinances. Operator, at Operator's cost, shall timely remove all snow, ice and debris or other hazards from the parking areas, walkways, and other areas of the premises to which Operator's employees, customers and other invitees will have access.

Case: 1:01-cv-00272 Document #: 1 Filed: 01/12/01 Page 39 of 48 PageID #:39

13.  **Non-Liability of Petrol for Damages.** Petrol shall not be liable for liability or damage claims for injury to persons or premises from any cause relating to the occupancy of the premises by Operator during the term of this operating agreement or any extension of this agreement. Operator shall indemnify and hold Petrol harmless from all liability, loss or other damage claims, judgments or obligations resulting from any injuries or losses of this nature.

14.  **Alterations and Additions.** Operator shall not make any alteration, improvements, or additions to the premises without the prior written consent of Petrol. In the event Petrol shall give consent to any such alteration, improvement or addition to the premises, Operator shall promptly pay for any such approved alterations, improvements, or additions and the same shall remain as part of the premises upon expiration or termination of this operating agreement. Operator shall promptly pay all contractors and suppliers who furnish labor or materials for such approved alterations and additions and shall not permit any liens to be placed upon the premises by reason of any such alterations and additions.

15.  **Assignment.** Operator shall not assign, lease or sublease the premises, voluntarily or by operation of law, or grant to any other person or entity the right to occupy or operate a business on the premises, without the prior express prior written consent of Petrol.

16.  **Destruction of Premises.** If the premises shall, without fault of Operator, be destroyed by fire or other casualty or be so damaged thereby in excess of 5% of the value of the premises (as determined in good faith by Petrol), Petrol may, by written notice delivered to Operator within thirty (30) days after destruction or loss, elect to

5

rebuild or repair. In such event, this agreement shall remain in force, and Petrol shall repair or rebuild the premises within a reasonable time after adjustment of the loss by insurer, putting the premises in as good condition as it was at the time immediately prior to the damage or loss. For that purpose, Petrol may enter the premises and the fees due under this agreement shall abate proportionately to Operator's loss of use of the premises. If Petrol fails to make that election within thirty (30) days of the date of loss or damage, this operating agreement shall terminate and Operator shall deliver possession of the premises to Petrol and Operator's obligation to pay fees shall cease effective the date of delivery of possession to Petrol. If the premises shall, without fault of Operator, be destroyed by fire or other casualty or be so damaged thereby in an amount equal to or less than 5% of the value of the premises (as determined in good faith by Petrol), this agreement shall not terminate and Petrol shall repair or rebuild the premises within a reasonable time after adjustment of the loss by insurer, putting the premises in as good condition as it was at the time immediately prior to the damage or loss, and the fees due under this agreement shall abate only proportionate to Operator's loss of use of the premises.

17.    Default. Each of the following events shall constitute the default or breach of this agreement by Operator:

(A)    If Operator shall fail to pay Petrol any fees when it shall be due under the terms of this Sublease.

(B)    If Operator shall fail to maintain the insurance required under this Sublease.

6

(C)   If Operator shall fail to perform or comply with any of the conditions of this agreement, and if the non-performance shall continue for a period of fifteen (15) days after notice thereof by Petrol to Operator, or if performance cannot reasonably be had within the fifteen (15) day period, Operator shall not in good faith have commenced performance within the fifteen (15) day period and shall not diligently proceed to completion of performance.

(D)   If Operator shall vacate or abandon the premises for a period of fifteen (15) or more days,

The waiver by Petrol of one occurrence of a default by Operator shall not be deemed to be a waiver of any subsequent event of default by Operator.

18.   **Removal upon Termination of Agreement.** Upon expiration of the term of the agreement or upon termination of this agreement, Operator shall promptly remove from the premises and deliver possession to Petrol. Such removal shall include all equipment, inventory and other personal property of Operator, its officers, employees, or agents. Any personal property of Operator left on the premises may be sold, scrapped or otherwise disposed of at Petrol's sole discretion.

19.   **Rights of Petrol Cumulative.** All rights granted to Petrol under applicable law shall be available to Petrol and shall be deemed cumulative and not exclusive. In the event of default, Petrol may pursue one or more legal or equitable remedies available to Petrol under law.

20.   **Notices.** Any notices to be given under this operating agreement shall be in writing to the following addresses, or such addresses as the parties shall in the future designate by written notice:

JAN.12.2001 11:25AM                                                    NO.887  P.9/23

Petrol Properties, LLC
6621 – 39TH Ave.
Kenosha, WI 53142

NEP Operating, LLC
8700 West Bryn Mawr Avenue
Suite 800 South
Chicago, Illinois 60631
ATTN: Charles Eberhardt

A notice shall be deemed given when personally delivered, sent by next day express
delivery, or deposited in the U. S. Mail by certified mail, return receipt requested.

21.    **Subordination.** Operator acknowledges and agrees that this operating
agreement shall be subordinate to any mortgage or security interest presently existing on,
or which Petrol may in the future cause to be placed on, the premises. Upon request by
Petrol or Petrol's mortgagee, Operator shall execute and deliver such estoppel certificate
as that mortgagee or security interest holder shall require from time to time.

23.    **Severability.** If any provision of this agreement is held to be illegal,
invalid or unenforceable, such provision(s) shall be severed and all the remaining
provisions of this agreement shall not be affected thereby and shall remain in full force
and effect.

24.    **Relationship of Parties.** Nothing contained in this agreement shall be
construed to create a partnership or joint venture between the parties, or to make either
party the agent, partner, joint venturer, franchisee, or employee of the other party, nor
responsible for the debts, obligations or losses of the other party. It is the intent of the
parties that they be and remain during the term of this agreement independent contractors.

25.    **Total Agreement; Applicable to Successors.** This Sublease contains the
entire agreement of the parties and cannot be changed or terminated except by written

8

instrument subsequently signed by the parties. This agreement and the terms and conditions hereof apply to and are binding on the legal representatives, successors and assigns of both parties, except this paragraph shall not be construed to permit an assignment of this agreement in violation of paragraph of this agreement.

26.    Applicable Law. This agreement shall be governed by, and construed in accordance with, the laws of the State of Wisconsin.

IN WITNESS WHEREOF, the parties have executed this operating agreement, as of the day and year first above written, by their duly authorized officers, partners, or members.

JAN.12.2001 11:25AM

NO.887 P.11/23

P.11/17

**SUBLESSOR:**

**PETROL PROPERTIES, LLC,**
a Wisconsin limited liability company

Witness: _David Enquist_
Print Name: _David W. Enquist_

By: _____
Name: Dr. Yogi Bhardwaj
Title: Managing Member

Witness: _____
Print Name: _James W. Hill_

STATE OF _WISCONSIN_ )
                                           ):ss
COUNTY OF _Kenosha_ )

On the _31st_ day of _O cto_ , 2000, before me, the subscriber, a Notary Public in and for the State and County aforesaid, personally appeared Dr. Yogi Bhardwaj who acknowledged himself to be the Managing Member of Petrol Properties, LLC, a Wisconsin limited liability company, and that he, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the company by himself as such Managing Member.

_James W. Hill_
NOTARY PUBLIC, WI
MY COMMISSION IS PERMANENT.

**SUBLESSEE:**

**NEP OPERATING, LLC,** an Illinois limited liability company

Witness: _____
Print Name: _____

By: _____
Name: _Charles Everhart_
Title: _Managing Member_

Witness: _____
Print Name: _____

STATE OF _Il_ )
                                       ):ss
COUNTY OF _Cook_ )

On the _31st_ day of _October_ , 2000, before me, the subscriber, a Notary Public in and for the State and County aforesaid, personally appeared _Charles Everhart_ who acknowledged himself to be the _Managing Member_ of NEP Operating, LLC, an Illinois limited liability company, and that he, being authorized to do so, executed the foregoing

10

JAN.12.2001; 11:26AM SSA   LAW ORGAN 2AT ON                          NO.887 22/24 P. 12/23
OCT-31-00  IV:14    FCOR SSA CUL LAR ORGANIZATION                    T-727   P.03/06  F-414

instrument for the purposes therein contained by signing the name of the corporation by himself as such officer.

WITNESS my hand and seal the day and year aforesaid.

Marjorie C. Boyle
NOTARY PUBLIC

"OFFICIAL SEAL"
Marjorie R. Boyle
Notary Public, State of Illinois
Cook County
My Commission Expires 09/29/01

# EXHIBIT A – LOCATIONS

Station No. 2003
226 N. Richmond Street
Appleton, Wisconsin

Station No. 2014
1130 Williamson Street
Madison, Wisconsin 53703

Station No. 2044
1616 Durand Avenue
Racine, Wisconsin 53403

Station No. 2123
245 N. Main Street
Fort Atkinson, Wisconsin 53536

Station No. 4091
2411 8th Street South
Wisconsin Rapids, Wisconsin 54494

Station No. 4155
404 N. Parker Drive
Janesville, Wisconsin 53545

Station No. 4169
907 20th Avenue
Monroe, Wisconsin 53566

Station No. 4233
1616 Maria Drive
Stevens Point, Wisconsin 54481

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS – 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I.(a) PLAINTIFFS | DEFENDANTS |
|---|---|
| NEP Operating LLC | National Petroleum Inc., and Petrol Properties, LLC |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Cook**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **Out of State**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Arthur F. Radke
Richard E. Gottlieb
Dykema Gossett PLLC
55 E. Monroe, Suite 3050, Chicago, IL 60603

ATTORNEYS (IF KNOWN)

010 0272

JUDGE CONLON

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury – Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☒ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | ☐ 871 IRS – Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

Appeal to District Judge from ☐ 7 Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Wrongful termination under Petroleum M.P.A., 15 U.S.C. Section 2801 et. seq.

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND: ☐ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____ DOCKET NUMBER _____

DATE
January 12, 2001

SIGNATURE OF ATTORNEY OF RECORD

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

**NEP Operating LLC**
  Plaintiff,

  v.

**National Petroleum Inc., and
Petrol Properties, LLC**
  Defendants.

DOCKETED
JAN 1 6 2001

**01C  0272**

Case Number:

FILED-ED4
01 JAN 12 PM 4:37
U.S. DISTRICT COURT

## APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

**NEP OPERATING LLC**

JUDGE CONLON

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

| (A) | | | (B) | | |
|---|---|---|---|---|---|
| SIGNATURE *[signature]* | | | SIGNATURE *[signature]* | | |
| NAME Arthur F. Radke | | | NAME Richard E. Gottlieb | | |
| FIRM Dykema Gossett | | | FIRM Dykema Gossett | | |
| STREET ADDRESS 55 East Monroe Street, Suite 3050 | | | STREET ADDRESS 55 East Monroe Street, Suite 3050 | | |
| CITY/STATE/ZIP Chicago, IL 60603 | | | CITY/STATE/ZIP Chicago, IL 60603 | | |
| TELEPHONE NUMBER (312) 551-4900 | | | TELEPHONE NUMBER (312) 551-4936 | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 3125515 | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6209165 | | |
| MEMBER OF TRIAL BAR? | YES ☒ | NO ☐ | MEMBER OF TRIAL BAR? | YES ☒ | NO ☐ |
| TRIAL ATTORNEY? | YES ☒ | NO ☐ | TRIAL ATTORNEY? | YES ☐ | NO ☒ |
| | | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☒ |
| (C) | | | (D) | | |
| SIGNATURE | | | SIGNATURE | | |
| NAME | | | NAME | | |
| FIRM | | | FIRM | | |
| STREET ADDRESS | | | STREET ADDRESS | | |
| CITY/STATE/ZIP | | | CITY/STATE/ZIP | | |
| TELEPHONE NUMBER | | | TELEPHONE NUMBER | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ |
| TRIAL ATTORNEY? | YES ☐ | NO ☐ | TRIAL ATTORNEY? | YES ☐ | NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ |

1-3